Filed 8/12/21  In re Adan R. CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re ADAN R., et al., Persons Coming Under the Juvenile Court Law. | H048307 (Santa Clara County Super. Ct. No. 17JD024659, 17JD024660) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. STEPHANIE R., et al., Defendants and Appellants. | |

Adan R. (father) and Stephanie R. (mother) appeal from a juvenile court order terminating parental rights to their sons, Adan or "Adam"[1] and Jayden (together, the children) and selecting adoption as the children's permanent plan under Welfare and Institutions Code section 366.26.[2]  On appeal, father contends the juvenile court abused its discretion by concluding that he had failed to establish the exception to termination of

---

[1] Adan, the older son, is frequently referred to in the record and by the parties as Adam.  To avoid confusion with father, who shares the same first name, we use the name Adam when referring to Adan, the minor.

[2] Unspecified statutory references are to the Welfare and Institutions Code.

parental rights based on a beneficial parent-child relationship (hereafter the "beneficial relationship exception")[3] (§ 366.26, subd. (c)(1)(B)(i)). Father also contends the juvenile court violated his constitutional right of due process by denying his request to call the children to testify at the selection and implementation hearing and for the completion of a bonding study. Mother on appeal presents no substantive arguments of her own but joins in father's arguments to the extent they support reversal of the juvenile court's order terminating parental rights. For the reasons explained below, we affirm.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Events Leading to the Section 366.26 Hearing*

The dependency proceeding in this case began in late July 2017, when Adam and Jayden (then 8 and 5 years old) were living with mother, who was their primary caretaker. Father and mother (together, parents) were separated. Father would take the children for visits on nights and weekends, but he did not live with them or provide their day-to-day care. Both children have special needs, including speech and developmental delays.

The Santa Clara County Department of Family and Children's Services (Department) placed the children into protective custody following an incident in late July 2017, when father was arrested for driving under the influence of alcohol with the children in the vehicle. At the time of the traffic stop, the children had no car seats or room to be seated safely because of items and garbage inside the vehicle. Mother arrived at the police station to retrieve the children but appeared to be under the influence. She denied using drugs and declined a drug test, had no car seats to transport the children, and blamed father for driving under the influence with the children in the vehicle. The

---

[3] The exception currently codified at section 366.26, subdivision (c)(1)(B)(i) is also commonly referred to as the " 'parental-benefit exception' " and the " 'beneficial parental relationship exception.' " (*In re Caden C.* (2021) 11 Cal.5th 614, 625, fn. 2 (*Caden C.*).)

children had abrasions and bruises that were deemed suspicious of physical abuse. A few days later, mother tested positive for methamphetamine and amphetamine. Father acknowledged he needed help to address alcohol abuse and homelessness. Father at the time had been convicted of domestic violence and was on probation.

The Department filed a juvenile dependency petition after placing the children in an out-of-home placement. The juvenile court sustained the allegations of the operative, first amended juvenile dependency petition, finding that mother and father had untreated substance abuse issues that impaired their ability to parent and placed the children at substantial risk of harm; mother had undiagnosed cognitive impairments that affected her ability to consistently and adequately parent the children; father regularly abused alcohol and had driven with the children while intoxicated on at least two occasions; father had a prior criminal conviction for domestic violence, and mother and father both had unaddressed, mutual domestic violence issues; and the children had bruises and abrasions resulting from unreasonable or neglectful acts or omissions by the parents. The juvenile court found Adam and Jayden came within the court's jurisdiction pursuant to section 300, subdivision (b)(1), and declared them dependents of the juvenile court and ordered family reunification services.

Mother received 18 months of reunification services but struggled to comply with the juvenile court's orders after a drug relapse in March 2018, though she successfully continued her visits with the children. However, by August 2018, mother had lost her housing and ceased her contact with the Department. She did not inquire about or visit the children. The juvenile court terminated reunification services as to mother after the 18-month review hearing in March 2019 and continued reunification services as to father, consistent with the Department's recommendation.

3

Father received 24 months of reunification services but was incarcerated for three periods during that time, totaling approximately 15 months.[4] After his release in October 2017 from incarceration following his arrest in July 2017, he was reincarcerated from May 2018 through September 2018 for violating probation. When father was not incarcerated, he participated in parenting and substance abuse services, weekly drug and alcohol testing, and supervised visitation during which he would engage with the children, bring food and drinks for them, and often arrive early and stay late when mother did not appear for her allotted time. At the 18-month review hearing, the juvenile court found that father was making significant and consistent progress since his release from incarceration, based on his regular contact and visits with the children and participation in his case plan. The court ordered father to attend counseling, complete several treatment programs (including a 52-week batter's intervention program), and continue his weekly visits with the children.

However, immediately after the juvenile dependency court hearing, father was taken into custody for a probation violation for failing to complete his court-ordered programs, and for failing to report to the probation office for appointments.[5] Father remained incarcerated until December 2019, during which time he enrolled in available services, had two in-person visits with the children (several other visits were cancelled due to transportation challenges), and wrote two letters to the children.

At the 24-month review hearing in September 2019, the Department recommended that the court terminate father's reunification services and set a section 366.26 hearing to identify a permanent plan for the children. The Department reported

---

[4] The Department reports state both that father was incarcerated for a total of 15 months and for a total of 13 months. Father later testified that based on his dates of incarceration and release from custody, he was incarcerated for a total of about 14 and one-half months during the dependency proceedings.

[5] The conditions of father's four-year probation included attending a domestic violence batterer's program, a 52-week child abuser's program, and a substance abuse program.

4

that father had taken an active approach to his case plan, especially when it became clear that mother would not reunify, and that when he was not incarcerated, he was consistent and punctual for visitation and engaged well with the children. Even so, the Department stated that father had not fully addressed the conditions that brought the children into the dependency, had been incarcerated three times during the dependency case, and continued to struggle with his sobriety and meeting the conditions of his probation, including testing positive for marijuana and cocaine as recently as March 2019. Mother, who reportedly continued to reside in the area but was homeless and struggling with her addiction, made no effort to contact the Department or inquire about the children during the reporting period. The foster caregivers expressed interest in a plan of adoption.

The juvenile court terminated father's reunification services at the 24-month hearing and reduced father's visitation to once a month, finding the extent of father's progress toward alleviating the causes necessitating the dependency to be "minimal." The juvenile court set a section 366.26 hearing for early January 2020, which ultimately was continued until July 2020.

B. *Section 366.26 Hearing Reports*

In anticipation of the section 366.26 hearing, the Department filed a report in January 2020[6] (January report) recommending the juvenile court terminate father's and mother's parental rights and free Adam and Jayden for adoption. The Department noted that father had been released from custody in December 2019, was looking for housing, and had requested a visit with the children. Father had acknowledged his struggle to secure housing and employment and meet the conditions of his probation, which had significantly impacted his ability to fully comply with reunification services. The Department noted that after having reunification services terminated, father continued to

---

[6] Unless otherwise indicated, all further dates refer to 2020.

stay in contact with the Department and make himself available for visitation and had expressed a desire to have the children returned to him and not freed for adoption.

Meanwhile, mother's whereabouts continued to be unknown, and she had not had any contact or visitation with the children since before March 2019. The children had been in the foster caregivers' home for two years and had developed a bond with them. The caregivers had provided daily care for the children and had been "strong advocates" for their academic and medical needs. The caregivers had expressed their commitment to a plan of adoption for both boys. The Department believed the children were thriving in their placement and would greatly benefit from a permanent home of adoption, which the caregivers could provide.

The Department concluded that father and mother had not alleviated the risk factors that brought the children to the attention of the juvenile court. Although it was evident father loved the children, he had been incarcerated for a substantial part of the reunification services period, and he was not able to have the children in his care or provide the stability they needed. The Department recommended the juvenile court terminate parental rights for both parents and set a plan of adoption.

On the date scheduled for the section 366.26 hearing, counsel for the children stated she was prepared to submit on the Department's recommendation and noted that Adam had expressed his wish to be adopted. The Department, however, had been unable to locate mother to serve her notice of the hearing, necessitating a continuance. The juvenile court continued the section 366.26 hearing to May 1, noting this delay gave father a "rare opportunity" to make further efforts toward reunification. The Department stated that it would work with father to resume visits and set up drug testing.

In April, father filed a petition under section 388 seeking to modify the order terminating reunification services and have the children returned to him with family maintenance services. Father asserted that since his release from custody in December 2019, he had secured housing and fulltime employment until he was laid off due to the

6

COVID-19 pandemic, was compliant with his probation and was "testing clean," and had completed several parenting and rehabilitation programs. Father stated there would be "many eyes on him to ensure the children's safety" and that family members had offered to help him care for the children.

The Department addressed father's section 388 petition in a May 1 addendum to its January report. The Department recommended moving forward with the termination of parental rights. It noted that while father had begun to participate in services, he had been unable to continue drug testing or to attend any services in person due to the onset of the COVID-19 pandemic, and he had not provided any verification of service participation. The Department acknowledged that the children had enjoyed three in-person visits with father after his release from custody, and that father had called the children once a week during the shelter in place. Yet, it pointed out that three of the nine tests before the shelter in place were missed or dilute, and that father had offered no detailed plans about how he would provide care for the children other than to seek help from family. The Department observed that father "has verbally expressed his love and desire to have his children [] returned to his care" but "has not demonstrated his ability [to] translate that same commitment to his sobriety, remaining out of jail and addressing the issues that brought the children to the court."

After hearing argument from the parties who appeared remotely for the May 1, court date, the juvenile court granted father an evidentiary hearing on his section 388 petition and the section 366.26 petition.

On July 20, after additional proceedings related to father's request for a bonding study and for the children to testify, which we describe in detail below, the Department filed a final addendum to its January report. The July 20 addendum retained the prior recommendation regarding termination of parental rights to free Adam and Jayden for adoption. The Department stated that in the past six months father had secured housing and employment but was unable to participate in services due to the COVID-19

7

pandemic and shelter in place, which had shut down service providers. Father had recently begun individual counseling and had enrolled in a 52-week parenting without violence program, though he did not have the technological capability to attend the remote classes. Father also restarted weekly drug and alcohol testing, which had not been available from mid-March through early June. He tested positive for marijuana on July 8. Mother's whereabouts remained unknown, and she had not had contact with the Department in approximately two years.

The Department reported that the children continued to do well in their placement. When asked about permanency with their caregivers, the children stated they wished to stay in their placement but would miss not seeing their father, and if they were to return to father, they would need help packing their belongings. The Department submitted that while the children love father and have an obvious relationship with him, they look to the caregivers—with whom they have lived for three years—as parental figures who provide comfort, guidance, affection, and daily care and supervision. The Department requested that the court make the children available for adoption, stating that the permanency and stability of a safe, nurturing environment in a permanent home "far outweighs any temporary sadness or loss they would experience if they are no longer able to see their parents."

C. *Father's Request for a Bonding Study and the Children's Testimony*

The parties appeared remotely on June 19 for a scheduled hearing. Father's counsel announced that father wished to proffer a bonding study to establish the beneficial relationship exception to termination of his parental rights. Psychologist Dr. Harmony Satre was available to begin the study immediately, and though she typically required two months for a bonding study, father's counsel believed it was possible to complete the study before the section 366.26 hearing set for July. Father had already asked the Department to begin in-person visits so the bonding expert could observe something other than phone calls.

8

Father also intended to subpoena both children as witnesses at the section 366.26 hearing. Father's counsel suggested the children could testify in chambers if the court found them likely to be intimidated by the formal courtroom setting or afraid to testify in the presence of a parent. Father submitted that since his release from custody in December 2019, he had "frequent and continuing contact with the children" who were asking—especially Adam—when they were going to come home. Father argued that given his bond with the children, the "hurry" to complete the case should not be "at the expense of damaging the children," and he hoped the juvenile court would ask the children "if they understand that if they are adopted they will not see their father again, and if that is their wish."

Counsel for the children indicated that she would move to quash any subpoena for the children's testimony. She did not object to father's expert observing in-person visits but did object to the expert communicating with and speaking directly to the children. Children's counsel further argued the recommendation to terminate parental rights had been pending for many months, and the request for a bonding study one month before trial was untimely. In her view, what the children needed was to "decide permanency for them and not have them confused and not understanding what's happening."

The juvenile court noted the delays in the case thus far. Though the 24-month review hearing took place in July 2019, problems serving notice on mother caused the section 366.26 hearing to be continued to May, and it was now set for July 20. The court supported father's request for a bonding study, if father's counsel could make the arrangements, but it would not further delay the hearing. The court "implore[d] the parties to work together" on a visitation schedule that would allow father's bonding expert to observe the visit or visits but declined to make any order regarding access to the children by the expert, finding it was "premature . . . to make such a finding, given that this request is just being raised now for the first time, and I don't have enough information by which to make a decision." The juvenile court scheduled a trial

9

management conference and deadlines for the motion to quash, expert reports, and any addendum to the Department's January report.

Prior to the section 366.26 hearing, the children's counsel filed a motion to quash father's subpoena and sought an order that the children not be compelled to testify. The motion included a declaration by Department social worker Lisvet Carrillo (Carrillo). Carrillo had worked with Adam and Jayden since September 2017 and had been qualified in other dependency cases as an expert in risk assessment and concurrent planning and/or placement.[7] Carrillo provided detailed information about the children and opined that it would be psychologically harmful for them to testify in court; she stated that any relevant information the children would likely share could be made available through her or through the children's counsel.

Relying on Carrillo's declaration, counsel for the children asserted in the motion to quash that it was not in the children's best interests to testify because of the likelihood that testifying would be psychologically and emotionally harmful. The motion explained that Adam and Jayden functioned at the level of children much younger than ten and eight years old due to their developmental and speech delays. It noted that Carrillo, who met with the children monthly, was "very concerned" about the children's ability both to understand questions about not seeing father in the future and to verbalize a response. According to Carrillo, the children lacked comprehension regarding court and the court case and had limited experience with unfamiliar adults. Carrillo believed testifying was an "innately stressful and anxiety-provoking experience and testifying as a child in an unfamiliar setting could have a lasting psychological impact on the children."

The motion to quash asserted the children already had "experienced multiple emotional and difficult conversations about permanency" with each continuance of the 366.26 hearing, and that questioning by strangers about adoption would add to the trauma

---

[7] The juvenile court later admitted Department social worker Carrillo as an expert in risk assessment and permanency planning.

and exacerbate their confusion about when the judge would decide the status of their "forever home." The motion to quash emphasized that the children have a relationship with and love father and do not wish to contradict his wishes but are also very comfortable in their caregivers' home. Having the children testify would exacerbate their " 'divided loyalties' " and guilt by making them feel they must choose between father and their caregivers. The motion to quash urged that father should not be permitted to cross-examine the children based on likely harm to the children, and because the information father sought could be elicited by cross-examining the social worker, by proffering an expert to discuss his beneficial bond with the children, or by testifying himself. Children's counsel asked, alternatively, that if the court did not quash the subpoena, it order that their testimony be taken in chambers and outside the presence of the parties.

The juvenile court revisited the motion to quash and father's request for a bonding study at a hearing on July 10. Attending remotely, father renewed his request that his expert not only observe two visits but also interview the children with their caregivers. Though father's counsel could not provide the court with an estimate of the time Dr. Satre would require with the children or the type of questions that would be asked, she argued it was essential in a bonding study for the psychologist to interview and see the children with their caregiver, to help develop an opinion on whether a significant and beneficial bond existed that would make termination of parental rights detrimental to the children, and to protect father's due process rights. Father's counsel emphasized that father sought only a typical bonding study, "nothing unusual." Counsel for the children objected to Dr. Satre interviewing the children, citing the reasons set forth in the motion to quash. On the subject of testimony, she asserted the court can "assume bond" and that the children love and have an attachment with father, based on the Department reports and observations father's expert would furnish from the visits, and maintained it was unnecessary to elicit that information from the children via testimony.

11

The juvenile court rejected father's proposal for the expert to interview the children, finding it was not "a fully formed request" and "too vague" to grant. The court was willing to consider a specific proposal but explained that as a function of the "very last minute nature" of the request, the court did not have enough information to make a decision about granting access to the children. The court noted the section 366.26 hearing was originally set for January, and father filed his section 388 petition in April, yet it was not until the second half of June that father raised the bonding study. The juvenile court declined father's counsel's invitation to impose parameters on the proposed interview with the children, stating it was not the court's function to formulate a plan.

The juvenile court also granted the children's motion to quash. It agreed with minor's counsel that cross-examination was not the proper vehicle to ensure the children's understanding of termination of parental rights and adoption, as that information was available through the social worker's report and the attorney representing them. Furthermore, inquiring about termination of parental rights and adoption would likely implicate the concerns about divided loyalties raised in the social worker's declaration. The court also considered the age of the children and their developmental factors, noting that even though Adam was about to turn 11, he and Jayden both presented functionally as younger than their chronological age in terms of language and speech, raising concerns about their ability to understand and process questions posed to them. The court concluded there was no basis for the children to testify that outweighed the potential detriment to them from that experience.

Father's expert, Dr. Satre, completed a document review of reports and related materials for the dependency period beginning in July 2017, a clinical interview of father, and five hours of behavioral observations over the course of two, in-person visits in July. She discussed her observations in a report for evaluation of attachment and bonding, filed on July 20, 2020. Her report noted that a thorough bonding study typically would include

12

observations of the children with their foster caregivers, as well as individual interviews and assessments of each child.  Dr. Satre also would have preferred to interview the foster caregivers but did not do so because of time constraints, lack of contact information, and ambiguity regarding whom she was able to contact.  Dr. Satre noted these "important data point[s]" (italics omitted) were missing from her review and limited her assessment.  Even so, the report observed based on the interview with father and review of the record that father had "made significant progress" in understanding how he had arrived at this situation and was "working on self-improvement and recovery."  The report provided detailed observations of the visits, noting the boys "constantly sought out and initiated physical contact" with father, wanted to know his opinion on various topics, seemed attentive when he spoke with them, and responded to his direction and efforts to redirect away from inappropriate subjects, like horror movies or when they would be with him again.  Dr. Satre noted the boys were excited to see father, greeted him energetically and affectionately, responded to his attention and sought to be close to him, asked unsolicited questions about visiting him and returning to his care (which he appropriately redirected), and became sad when it was time to part.  Dr. Satre indicated there was "no doubt" that father and the children shared mutual love and affection.  The children appeared to look to and accept father in the parenting role, referred to him as " 'daddy,' " and spent both visits engaging with him.

Dr. Satre concluded that while the observation sessions were "not sufficient to form a complete opinion" without access to the children, it appeared that "both children demonstrated clear and meaningful parent-child relational attachment and bond with [father]."  Dr. Satre noted the apparent "positive parental attachment" between the children and father but acknowledged the quality of her opinion was "directly affected by [her] extremely limited access to the children."  Dr. Satre summarized her observations by stating that father "appears to occupy a large and positive role in the children's life, and to take . . . that relationship away from the children does seem maladaptive and even

13

cruel, based on the very limited data I have. [¶] However, because my data is so limited in this case, my opinion is also severely limited and I cannot at this point make any determination as to the bond between [the] children and father" other than to note that the bond "appeared positive, the boys raised no red flags, and seemed genuinely attached to their father."

D. *Contested Section 366.26 Hearing*

The juvenile court held a combined hearing on July 20 and July 22.[8] The court considered both the contested 366.26 hearing on selection and implementation of a permanency plan as well as father's section 388 petition, filed in April, requesting the juvenile court return the children to his care or reinstate reunification services.[9]

At the time of the hearing, Adam was almost 11, and Jayden was 8. The Department and children's counsel argued in favor of terminating mother's and father's parental rights and pursuing adoption as the permanent plan under section 366.26. The juvenile court admitted into evidence the Department's January report, the May and July addenda, and Dr. Satre's report. The juvenile court also heard testimony from father and from Department social worker Carrillo.

Father testified about his interactions with the children. He described his weekly phone calls with them, which he attended faithfully, though he did not have any means of video calling. The children would ask each time when they could come home, saying they had been good boys, which father described as heartbreaking. Father confirmed the

---

[8] The juvenile court overruled the renewed objection of mother's counsel to the adequacy of notice to mother under the emergency California Rules of Court, rule 6(c)(3), adopted by the Judicial Council on April 6 to address notice of remote juvenile dependency hearings during the COVID-19 pandemic. Mother was not present at the July 20 and July 22 section 366.26 hearing. According to the juvenile court, mother had missed the last seven in-person court hearings, and the last hearing in which she appeared was more than two years ago on February 9, 2018, notwithstanding diligent efforts to locate her.

[9] Because father has not appealed the juvenile court's determination on the section 388 petition, we focus our summary of the hearing on the section 366.26 determination.

14

reports reflecting that he had visited with the children since the beginning of the case, was prompt for every visit, engaged the children in activities, and stepped up to fill the extra time when mother did not show up. Visits also occurred during his most recent period of incarceration, though several were cancelled for reasons out of his control; father took advantage of every single visit he could.

Father also testified about the problems that led to the juvenile dependency. He said his main issue was alcohol abuse, but he also struggled with domestic violence in his relationship and a lack of parenting skills. Father believed that through the classes and programs he completed, he had developed outlets other than substance abuse for dealing with depression, including opening up to and relying on family members, and had learned parenting and anger management skills. Father believed he was in full compliance with his case plan. He had completed numerous, specified parenting classes, a domestic violence assessment, had partially completed the 52-week batterers intervention program required as part of his domestic violence conviction, and was engaged in counseling. He had resolved his struggle with homelessness and was renting a two-bedroom house with a cousin, which had space for the children. He also was employed full time. He was complying with testing. He had recently tested positive for marijuana but never used marijuana while caring for the children and believed marijuana was not a problem for him. Although his primary substance abuse problem was with alcohol, he had not used it in 16 months and had completed his substance abuse assessment and programming, including a 12-week rehabilitation program while incarcerated.

On cross-examination, father acknowledged that the children had lived with mother before the dependency proceedings and he was "[b]asically" visiting during that time and not doing the day-to-day parenting. He agreed that he had endangered the children by driving with them while he was intoxicated. And he acknowledged that he continued abusing substances for part of the dependency period. He agreed that his

15

testing records since his last release from custody in December 2019 did not demonstrate sobriety because of missed and diluted tests and the positive test for marijuana.

Father denied that he had engaged in domestic violence since 2014, denied claims that mother made against him in 2017, and denied he had ever physically abused the children. He attributed statements Adam made to a Department social worker in relation to a prior referral, in which Adam said his father "[was] not nice" and had "pow pow'd" him, to the fact that Adam had a learning disability and "was not aware of what he was saying." Father stated he was involved in the children's schooling before they entered the dependency system; however, he did not know what school either child was currently attending and was not participating in either child's individualized education plan meetings.

Department social worker Carrillo testified as an expert in risk assessment and permanency planning. Carrillo confirmed that the Department had no means to assist father in accessing Wifi or technology that would have enabled him to have video visits with the children during the shelter in place. Carrillo had "a lot of concerns" about father's sobriety. She testified that his continued marijuana use and history of missed and diluted tests contradicted his claim of sobriety and suggested he was still struggling with addiction. Father had not shown consistency in attending meetings, working with a sponsor, or drug testing. Carrillo believed father was still in the early stages of addressing the issues in his case plan.

Carrillo confirmed there was love and connection between the children and their parents. The children at times asked about visiting mother, and they expressed love and affection toward father. Carrillo testified, however, that "at the same time, they also feel that same connection with their current caregivers" to whom they look for attention, love, guidance, discipline, and to meet their basic needs. The children were thriving in their placement and had developed a relationship with their caregivers. When Carrillo spoke with the children about staying with the caregivers and not seeing father, they

16

"acknowledged that they feel sad but they've also acknowledged that they want to stay in their current placement." Yet the children also indicated that if they were going with their dad, they needed help packing their belongings. It was therefore "very clear" to Carrillo that the children loved both the caregivers and their parents and felt "divided and conflicted" between the two. Carrillo opined it would not be detrimental to the children for parental rights to be terminated, because the benefits of adoption outweighed the "temporary period of sadness" the children would experience in not continuing a relationship with father or mother.

E. *Juvenile Court's Ruling Terminating Parental Rights*

The juvenile court issued its rulings on the sections 388 and 366.26 petitions following the conclusion of testimony and argument on July 22. It had considered the testimony as well as father's filed petition, the Department's various reports, and the exhibits submitted by father's counsel, including the report by Dr. Satre. The court denied father's section 388 petition, finding that father had shown meaningful evidence of changed circumstances in his employment and housing situation but had not addressed the primary issues that brought the children to the dependency court, including his "historical pattern" of reincarceration and substance abuse.[10]

Addressing section 366.26, the juvenile court found that a permanent plan of adoption was appropriate for Adam and Jayden, who were generally and specifically adoptable. It further found that father had not established the beneficial relationship exception to adoption.

The juvenile court observed there was "no doubt" father loved the children, was exceptionally devoted to them, and had shown good parenting skills during visits that were consistent, positive, and loving. It found that father satisfied the first prong of the beneficial relationship exception test based on regular visitation. But the juvenile court

---

[10] Father does not challenge on appeal the juvenile court's ruling on his section 388 petition.

found that father could not satisfy the other prongs of the test, because he could not demonstrate a beneficial relationship or show the benefit outweighed that of the permanency and stability of adoption.

The juvenile court recognized the children loved father. The court was sure that if father had been permitted to call Adam and Jayden as witnesses, they would have testified that they loved father and always asked when they could return home to him. But the juvenile court questioned the benefit of the relationship as a compelling reason not to provide the permanency and stability of adoption. The court noted that father had been "mostly out of his son[s'] lives" for the past three years, with multiple incarcerations and only supervised visits. It determined that father did not occupy a large enough parental role in the children's lives to deny the children the long term benefits of stability and certainty in an adoptive home, noting that father had never been the children's primary caretaker, even during the early period in their lives, lacked any direct knowledge of the children's educational and medical needs or daily care, and that "frequent and loving visits" were not enough to demonstrate the compelling interest required by law.

The juvenile court agreed to a limited extent with Dr. Satre's assessment, stating that severing the relationship between the children and father "would be maladaptive and even cruel" but only when viewed "from the limited perspective of the short term consequences of this decision." The court reasoned that because the law required it to consider any short term effects in light of the long term consequences of denying the stability and security afforded by adoption, "[i]n the end . . . that denying the children the benefit of an adoptive home in this case would be even more maladaptive and cruel, particularly given how long this case has gone on." The juvenile court consequently ordered adoption as the permanent plan for Adam and Jayden, terminating parental rights as to both father and mother.

18

Father timely filed a notice of appeal, followed by an amended notice of appeal, of the juvenile court's orders denying the section 388 petition and terminating parental rights under section 366.26.[11] Mother timely filed a notice of appeal of the juvenile court's orders.

## II.  DISCUSSION

Father challenges the juvenile court's decision terminating his parental rights on two grounds.  He contends the juvenile court (1) violated his due process right to a fair and just proceeding by denying him the right to complete the bonding study and call the children to testify, and (2) abused its discretion by finding the beneficial relationship exception inapplicable.  Father asserts that the juvenile court deprived him of the right to introduce evidence and adequately test the sufficiency of the evidence presented by the Department.  Father further asserts that he met his burden of establishing the beneficial relationship exception under the standards recently clarified by the California Supreme Court in *Caden C.*, *supra,* 11 Cal.5th 614.  The Department opposes father's claims, arguing that the juvenile court's rulings were amply supported by substantial evidence and well within the court's discretion.  Adam and Jayden have not participated in this appeal.  Mother joins in father's arguments to the extent it may inure to her benefit and she has standing to do so, but she concedes there is no independent error as to her.

*A.  Governing Law and Standards of Review*

At a section 366.26 hearing, the juvenile court must determine "whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan." (*Caden C.*, *supra*, 11 Cal.5th at p. 625.)  As articulated by the California Supreme Court, "the question before the court is decidedly not whether the parent may resume custody of the child." (*Id.* at p. 630.)  Instead, "when the court

---

[11] Father appears to have abandoned his appeal from the juvenile court's denial of his section 388 petition, having failed to raise any issues or assert error related to the section 388 petition.

19

orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Ibid.*)

According to the procedure set forth in section 366.26, "the court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631.) The statutory reasons for departing from " 'the norm' " of adoption apply only in " 'exceptional circumstances.' " (*Id.* at p. 631.)

The beneficial relationship exception, which allows the juvenile court to choose a permanent plan for the child other than adoption, applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child [because]: [¶] The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) That exception "is limited in scope." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) To show this exception applies, a parent must establish by a preponderance of evidence the following three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Ibid.*) Overall, "[t]he purpose of the parent-child relationship exception is to protect the parent-child relationship when its continuation is more beneficial to the dependent child than a permanent plan of adoption." (*In re C.B.* (2010) 190 Cal.App.4th 102, 128–129.)

An appellate court reviews a juvenile court's ruling on the application of the beneficial relationship exception using a "hybrid" standard. (*Caden C.*, *supra*, 11 Cal.5th

20

at p. 641.) The substantial evidence standard applies to the first two elements of visitation and a beneficial relationship. (*Id.* at pp. 639–640.) With respect to the third element of whether termination of parental rights would be detrimental to the child, the reviewing court reviews the juvenile court's decision for abuse of discretion. (*Id.* at p. 640.) Overall, the hybrid standard endorsed by the California Supreme Court "embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the [juvenile] court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Id.* at p. 641.)

The termination of parental rights at a section 366.26 hearing must comport with the constitutional protections of due process. (*David B. v. Superior Court* (2006) 140 Cal.App.4th 772, 777.) At the selection and implementation stage of permanency planning, the due process right to confront and cross-examine adverse witnesses at contested hearings is not as broad or unfettered as in earlier stages of a dependency proceeding, where family preservation is the primary focus and the parent's interest in reunification is given precedence over the child's need for stability and permanency. (*In re Thomas R.* (2006) 145 Cal.App.4th 726, 733 (*Thomas R.*); *David B.*, at p. 778.) Even so, those rights are never extinguished. (See § 366.26, subd. (a) [specifying procedures for hearings terminating parental rights].)

We generally review the juvenile court's ruling to exclude the testimony of a child to avoid psychological harm to the child for abuse of discretion. (*In re Daniela G.* (2018) 23 Cal.App.5th 1083, 1090 (*Daniela G.*).) To the extent the juvenile court's decisions to exclude testimony of the children and deny father's expert access to speak with the children for completion of the bonding study in this case raise legal questions concerning father's constitutional right of due process in ensuring the fairness of the proceedings, we review those issues de novo. (See *In re Taylor* (2015) 60 Cal.4th 1019, 1035.)

*B. Juvenile Court's Application of the Beneficial Relationship Exception*

Father contends the juvenile court erred in its determination that the beneficial relationship exception was inapplicable. He asserts there was no substantial evidence supporting the juvenile court's decision, especially given the court's findings that father's visits with the children were consistently positive and loving, and that severing the relationship—at least in the short term—would be "maladaptive and even cruel." The Department responds that substantial evidence supports the juvenile court's factual findings as far as benefit and detriment, given father's limited parental role in the children's lives as compared with the significant benefits afforded by adoption, and the juvenile court acted within its discretion in deciding to terminate father's parental rights.

With respect to the first element of the beneficial relationship exception (*Caden C.*, *supra*, 11 Cal.5th at p. 631), we agree with father that substantial evidence at the section 366.26 hearing supports the juvenile court's determination that father satisfied the element of regular visitation and contact, which in any event the Department does not challenge. We also agree with father that contrary to the juvenile court's implied finding that his relationship with the children was "not enough" to establish a continuing benefit,[12] substantial evidence supports an affirmative determination as to the second element based on evidence of "a relationship, the continuation of which would benefit" the children. (*Caden C.*, at p. 631, italics omitted.) That conclusion is not determinative, however, because the juvenile court also must exercise its discretion, as it did here, to decide as to the third element whether it ultimately would be harmful to the child to sever the relationship and choose adoption. (*Id.* at pp. 629–630, 633.)

---

[12] The juvenile court did not make an express finding on the second element of the test articulated in *Caden C.* to establish the beneficial relationship exception, but rather combined its assessment of benefit to the children and detriment, concluding that denying the children the stability and permanency of an adoptive home would be more detrimental than the effects of severing their contact with father.

22

The record contains ample evidence of father's positive relationship with the children. The Department reports confirm that visits went well for the children, who were eager to see father, enjoyed talking and playing with him, and showed him affection. Dr. Satre reported that both children exhibited a positive emotional attachment toward father, seeking his attention and physical closeness and asking unprompted when they would be with him again.

The consistently positive appraisals of father's visits with the children support a determination of beneficial relationship. In considering the relevant facts, a juvenile court must focus on the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The California Supreme Court in *Caden C.* explained that various factors may be relevant in evaluating the benefit to the child of continuing the relationship, including " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*) Courts also may look to a child's affect—"how children feel about, interact with, look to, or talk about their parents." (*Ibid.*) Applying those considerations here, we conclude that substantial evidence supports a finding that the children derived benefit from their relationship with father in the form of comfort and reassurance, physical engagement and play, and affection. (See *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)

The fact that the parent does not occupy a "greater parental role," as the juvenile court found in this case, does not disqualify a parent from establishing a beneficial relationship. In *In re S.B.* (2008) 164 Cal.App.4th 289, cited with approval by the California Supreme Court in *Caden C.*, *supra*, 11 Cal.5th at page 632, the Court of Appeal explained that California case law "does not narrowly define or specifically identify the type of relationship necessary to establish the exception. The exception may apply if the child has a 'substantial, positive emotional attachment' to the parent." (*In re S.B.*, at p. 299; accord *Caden C.*, at p. 633.) It is apparent from the record that such a substantial, positive emotional attachment existed here.

23

Nevertheless, turning to the third element, we perceive no abuse of discretion in the juvenile court's determination that the beneficial relationship exception did not apply. While a range of factual determinations may inform the decision (each properly reviewed for substantial evidence), "the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent — is discretionary and properly reviewed for abuse of discretion." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) To evaluate detriment, the juvenile court must decide "whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.) Fundamental to this inquiry is "how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.)

A parent's continuing struggles with such issues as led to the dependency "are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Caden C.*, *supra*, 11 Cal.5th at p. 638.) Likewise, when the court weighs whether termination would be detrimental, it "is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)." (*Id.* at p. 634.) Rather, the court ascertains whether there is a "compelling reason for determining that termination would be detrimental to the child" (§ 366.36, subd. (c)(1)(B)) based on the statutory factors of visitation and relationship (*id.*, subd. (c)(1)(B)(i)). "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, at pp. 633–634.)

Father fails to demonstrate an abuse of discretion by the juvenile court in applying these principles. Father asserts that the children will be "significantly harmed" from the severance of the relationship, as evidenced by the juvenile court's finding that in the

short-term it would be "maladaptive and even cruel" to terminate parental rights. He also points to the children's unsolicited questions about visits and statements to the social worker that they would miss not seeing father and were going to be sad to no longer continue the relationship. Father questions how the dependency system can sanction terminating a parental relationship when the result is "maladaptive, even cruel" to the children the system was designed to protect.

There is no question that weighing whether to terminate parental rights and make way for adoption is a "fraught determination." (*Caden C.*, *supra*, 11 Cal.5th at p. 625.) But father's arguments fail to acknowledge that the juvenile court engaged in precisely the sort of "delicate[] balancing" of factual determinations permitted and indeed required by the statute. (*Id.* at p. 641.) Here, substantial evidence supported each of the juvenile court's factual determinations. The court fully recognized and acknowledged father's bond with the children, expressly finding that if it had permitted father to call the children as witnesses, they would have testified that they loved him and always asked when they could return home. The court did not doubt the existence of a significant bond. And the court properly considered the harm of severing that bond, crediting Dr. Satre's assessment. Yet, the court also considered that father had been "mostly out of" the children's lives for the preceding few years, and beyond that had never been their primary caregiver. These observations properly addressed " 'the strength and quality of the natural parent/child relationship' " (*Caden C.*, at p. 634) and weighed the detriment of losing that relationship against the benefits of a new adoptive home, considering the "stability and security" provided by that home as well as "how long this case has gone on."

On balance, the juvenile court's ultimate determination that "denying the children the benefit of an adoptive home in this case would be even more maladaptive and cruel" represents the subtle weighing of case-specific benefits and burdens that the statute requires. (See *Caden C.*, *supra*, 11 Cal.5th at p. 633.) This court may not " 'substitute its

25

own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Id.* at p. 641.)  We conclude that the juvenile court rendered its decision in accordance with the statutory scheme.  Having carefully weighed the facts and considered the difficult questions of detriment and benefit, the juvenile court did not abuse its discretion in denying application of the beneficial relationship exception to the termination of father's parental rights.

We also are not convinced by father's argument that he would have been able to establish the beneficial relationship exception if he had been permitted to call the children to testify, or if Dr. Satre had been able to interview Adam and Jayden.  The juvenile court's factual determinations, as previously noted, credited Dr. Satre's observations and preliminary conclusions about the strength of the relationship and father's testimony that the children "always ask" about going home.  The court heard the social worker's testimony about her conversations with the children, their stated desire to stay with the caregivers and acknowledgment they would be sad not to see father, and evidence they often expressed love and affection for their parents and felt divided and conflicted.  Both sides in this case proffered evidence of love and bond between father and the children, making that fact, in effect, undisputed.  Father has not provided any basis from which to conclude that additional evidence cementing these already well-established facts would have changed the juvenile court's weighing of harm and benefit, which in the end did not turn on the absence of a meaningful parent-child bond but rather on a determination that denying the permanency and stability of the adoptive home would be more detrimental to Adam and Jayden than termination of the parental relationship.

We now turn to father's related contention that, in excluding the children's testimony and preventing Dr. Satre from interviewing the children for the bonding study, the juvenile court deprived him of due process.

*C. Father's Due Process Claims*

Father contends the juvenile court violated due process guarantees when it denied his evidentiary requests to call the children as witnesses at the section 366.26 hearing and for permission for his expert witness to speak with the children for a bonding study. Father acknowledges that different levels of due process protection apply at different stages of dependency proceedings (*Thomas R.*, *supra*, 145 Cal.App.4th at p. 733) but argues the juvenile court's rulings unfairly limited his right to confront and cross-examine witnesses and to present evidence in his favor. The Department disputes any due process violation.

    1.  <u>Request for a Bonding Study</u>

Father asserts the juvenile court should have granted his request for Dr. Satre to interview the children and perform a complete bonding study. He points to the California Supreme Court's recognition in *Caden C.* that "often expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 632–633.) Father contends that such detailed, expert testimony was absent in this case, and as a result he was unable to demonstrate the extent of his parental relationship or present expert testimony regarding the emotional instability and other issues Adam and Jayden might experience as a result of losing that relationship.

The decision to order a bonding study falls within a court's broad discretion to appoint an expert under Evidence Code section 730, where expert evidence is or may be required. (See *In re S.R.* (2009) 173 Cal.App.4th 864, 869; accord *In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084 (*Jennifer J.*).) A bonding study may be an important and informative aid in considering the beneficial relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) As father points out, while not mandated by statute or case authority, a court obtaining a bonding study receives a more objective and detailed

psychological opinion than would otherwise be available to inform the assessment of the benefit and detriment of terminating parental rights. (See, e.g., *id.* at p. 632.) Our Supreme Court recently suggested, for this reason, that trial courts "seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Id.* at p. 633, fn. 4.)

Here, the juvenile court both seriously considered father's request and afforded him a fair opportunity to propose a reasonable means of completing the study without further delaying the section 366.26 hearing. Father first raised a bonding study at the hearing on June 19, approximately one month before the scheduled section 366.26 hearing. At the time, father's counsel explained that Dr. Satre would need at least two months for the bonding study. The juvenile court deemed it "an 11th hour request." Indeed, father's request to initiate a bonding study came more than four months after the January 10 date originally set for the section 366.26 hearing (which had been continued to provide notice to mother) and two months after father filed his section 388 petition in April. The court nevertheless directed the parties to work together to allow father's expert to observe any visits that occurred, stating it would not further delay the hearing. The court declined to grant access to the children over their counsel's objection, explaining that the issue had just been raised and there was no basis to render a decision. Although father renewed his request shortly before the section 366.26 hearing for Dr. Satre to interview the children, his counsel was unable to provide a concrete proposal or suggest any parameters for the interview being sought. The juvenile court rejected the request on the basis it was not a fully formed request and was made at the last minute.

It is apparent that father's demand for completion of a bonding study under these circumstances risked further delay of the permanency planning process. Given that there is no requirement, statutory or otherwise, for completion of a bonding study prior to a contested section 366.26 hearing, the juvenile court acted well within its discretion in considering the timeliness and reasonableness of the request, as well as the objections and

28

concerns interposed by the children's counsel. (See *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1341; *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197.) The juvenile court permitted father to arrange in person visitation with the children in the presence of father's expert and to file a detailed expert report, which the court considered and credited.

For these reasons, we reject father's contention that the juvenile court's ruling precluded him from rebutting Department social worker Carrillo's expert testimony with his own expert testimony. Under the circumstances here, we conclude the juvenile court neither abused its discretion in limiting Dr. Satre's contact with the children, nor deprived father of a fair hearing as a result.

2. Request for the Children's Testimony

Father asserts that alongside his request for Dr. Satre to evaluate the nature and quality of Adam's and Jayden's bond with father, he "[p]erhaps more importantly" had a right to have the children testify concerning their relationship and the loss of the relationship. Father contends the juvenile court wrongly denied him a fair and meaningful opportunity to examine his children's "actual feelings and concerns" and to provide key demonstrative evidence of the detriment the children would experience from severing the parental relationship.

Father maintains the children could have testified without experiencing psychological harm. He argues there was no evidence to support children's counsel's assertion that Adam and Jayden would be adversely affected by testifying, because by all accounts both children's developmental function had improved, and they did not exhibit the type of emotional or psychological strain typically seen in children for whom testifying would be retraumatizing. Furthermore, he points out that as of the July 22

hearing date, Adam was only three days short of 11 years old and was entitled by statute to notice of his right to attend the hearing.  (§§ 349, subd. (d), 366.26, subd. (h)(2).)[13]

Father also asserts that the Department social worker Carrillo's assessment of psychological harm based on the children's lack of understanding of court and limited exposure to "new people" was unsupported, especially because the children interacted with a range of people throughout the dependency proceeding and apparently discussed these same issues with those individuals without triggering psychological distress.  Father submits that in granting the children's motion to quash, the juvenile court disregarded the various measures and alternatives he had proposed for the children to familiarize them ahead of time and reduce the stress of testifying in a formal courtroom setting, including that the court could have allowed them to testify in chambers outside the presence of the parents.  (§ 350, subd. (b).)

Finally, father contends the children's direct testimony was needed because it would have materially affected the juvenile court's resolution of the beneficial relationship exception and was the only way for father to test the Department's evidence and impeach the basis for the social worker's opinion, implicating his due process right to present evidence of significant probative value.  Father relies on *In re Amy M.* (1991) 232

---

[13] Father asserts a "further violation" of his right to a fair hearing based on the absence of any determination by the juvenile court that Adam was properly notified of his right to attend the hearing and the reason he was not present.  (§§ 349, subd. (d), 366.26, subd. (h)(2).)  It is unclear on what authority father would have standing to raise this procedural objection on behalf of Adam, who was represented by his own counsel throughout the dependency proceedings.  Father maintains he has the right to raise the issue because he was aggrieved by his son's absence from the proceedings; but that argument conflates father's interest in obtaining Adam's testimony—and father's attendant right to appeal the ruling quashing his subpoena—and Adam's interest in a procedural protection specific to him.  (See, e.g., *In re Jayden M.* (2014) 228 Cal.App.4th 1452, 1459 [noting that while standing to appeal is construed liberally, " '[a] parent cannot raise issues on appeal which do not affect his or her own rights' "].)  What is more, father forfeited any argument he might have raised based on Adam's right to notice under section 349 by failing to raise it in the juvenile court.  (See *Daniela G.*, *supra*, 23 Cal.App.5th at p. 1090.)

Cal.App.3d 849 (*Amy M.*) to support his contention that exclusion of the children's testimony deprived him of a fair hearing.

*Amy M.* arose from jurisdictional orders finding a daughter and son dependents of the court based on the father's molestation of the daughter. (*Amy M.*, *supra*, 232 Cal.App.3d at pp. 854–855.) The basis for juvenile court jurisdiction over the son, Michael, was his alleged, substantial risk of suffering emotional harm because his sister had been sexually abused; however, that basis was disputed by the parents' expert who opined that Michael's psychological distress was due to his removal from the family home and his mother's custody. (*Id.* at p. 865.) The juvenile court received the daughter's testimony in chambers (*id.* at p. 858) but rejected the parents' request to call Michael based on a neutral evaluator's opinion that he was under severe psychological stress and would suffer "additional emotional harm" if called to testify. (*Id.* at p. 864.)

On appeal, a panel of this court held that the juvenile court's refusal of the parents' request to call Michael to testify violated due process by denying them the opportunity to use his testimony to impeach—or validate—the experts' competing conclusions as needed to determine the truth of the allegation. (*Amy M.*, *supra*, 232 Cal.App.3d at pp. 865–866.) Neither was there prior testimony or "any report containing Michael's statements which could have substituted for his testimony." (*Id.* at p. 865.) Since there was no substitute for Michael's testimony that might have satisfied due process, this court concluded the error was not harmless beyond a reasonable doubt and reversed the jurisdictional orders. (*Id.* at pp. 867–868.)

Subsequent to this court's decision in *Amy M.*, courts have recognized that a juvenile court may lawfully exercise its discretion "to exclude the testimony of a child in order to avoid psychological harm to the child, even though that testimony is relevant, the child is competent to testify, and the child is both practically and legally 'available' to testify." (*Jennifer J.*, *supra*, 8 Cal.App.4th at p. 1088); see also *Daniela G.*, *supra*, 23 Cal.App.5th at p. 1091.) The court in *Jennifer J.* reasoned that a juvenile court may

31

refuse to compel the testimony of a child, consistent with a parent's due process rights, when requiring the testimony "would cause psychological stress and injury, and the possible benefit derivable from [the] testimony would not warrant the injury it would cause." (*Jennifer J.,* at p. 1086.) The request for the child's testimony in *Jennifer J.* arose in the context of a selection and implementation hearing under section 366.26, in which the parents sought to establish that seven-year-old Jennifer was bonded to them and desired continued parental contact. (*Id.* at p. 1085.) As in this case, the juvenile court in *Jennifer J.* stated it would take into consideration " 'that Jennifer is bonded and would wish to have contact with her parents.' " (*Ibid.*) However, the juvenile court assessed that "calling Jennifer would be a damaging experience for her. Requiring her testimony would cause psychological stress and injury, and the possible benefit derivable from her testimony would not warrant the injury it would cause." (*Id.* at p. 1086.)

The Fourth District Court of Appeal, Division 1, agreed with the juvenile court's exercise of discretion. (*Jennifer J., supra*, 8 Cal.App.4th at pp. 1089, 1091.) It determined that *Amy M.* was not controlling authority where the minor's testimony would not have assisted in resolving a disputed issue. (*Id.* at p. 1087.) The court explained that the juvenile court's discretion to exclude a child's testimony derives from "the overriding objective of the dependency hearing—to preserve and promote the best interests of the child. It would be a perversion of the procedure to impose upon it a requirement that the child's testimony always be presented, regardless of the trauma resulting to the child therefrom, and regardless of the necessity of such testimony in the resolution of the issues before the court." (*Id.* at p. 1089.) The court concluded that where "the child's desires and wishes can be directly presented without live testimony, where the issues to be resolved would not be materially affected by the child's testimony, and where it is shown that the child would be psychologically damaged by being required to testify, we hold the juvenile court judge has the power to exclude such testimony." (*Ibid.*)

32

Having carefully considered the record and father's arguments, we are not convinced that the facts of this case present a close analogy to *Amy M.* Not only is the procedural posture and focus of inquiry markedly different between a jurisdiction hearing, as in *Amy M.*, and a selection and implementation hearing under section 366.26, but there is no comparable dispute as to a material issue that the children's testimony could have helped to resolve. In *Amy M.*, the material question was the disposition of the dependency petition allegation as to Michael, and the evidence before the court consisted of competing expert testimony on the subject central to disposition. (*Amy M.*, *supra*, 232 Cal.App.3d at p. 865.) Here, the evidence underlying the juvenile court's determination was not contested, in that both social worker Carrillo and Dr. Satre reported the children were eager to see father and their relationship with father was affectionate and loving— so much so that the children's counsel told the juvenile court it could "assume bond" between them. Carrillo acknowledged the children felt torn about wanting to stay with their caregivers and would be sad if they no longer saw father. Dr. Satre opined, more strongly, that based on the limited data she had, father "appear[ed] to occupy a large and positive role in the children's life, and to take . . . that relationship away from the children does seem maladaptive and even cruel."

Although father insists he was deprived of probative and compelling evidence of the children's desires and feelings around termination, he does not establish how their testimony would have materially affected the assessment of detriment under the exception, given the substantial evidence already before the juvenile court. (See *Daniela G.*, *supra*, 23 Cal.App.5th at p. 1095.) The juvenile court's determination (based on reports and testimony, including father's testimony) that the children would have testified they loved father and always asked to see him meant that the only fact in flux was the degree of harm and whether it outweighed the benefit afforded by the permanency and stability of adoption. That difficult calculus fell squarely within the discretion of the juvenile court, requiring a "a delicate balancing of these determinations as part of

33

assessing the likely course of a future situation that's inherently uncertain." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)

Furthermore, unlike in *Amy M.* where there was no "substitute for Michael's testimony which might have satisfied due process" because he had not testified and there was no report containing any of his statements (*Amy M.*, *supra*, 232 Cal.App.3d at p. 865), the juvenile court received evidence of the children's statements in the Department's reports and via the Department social worker Carrillo's testimony. Father had a full and fair opportunity to cross-examine Carrillo on the children's statements and her expert opinion that the benefits of adoption would outweigh the "temporary period of sadness" she believed would result if they no longer saw their parents. Father disagrees with the social worker's assessment of the psychological harm and stress the children would experience if forced to testify about their relationship with father and their feelings about termination. However, substantial evidence in the record supports the juvenile court's finding, in granting the children's motion to quash, that examining the children in court (either in the courtroom or in chambers) was not the proper vehicle to ensure their understanding about termination of parental rights—both because the children's ages and developmental challenges made it more difficult to process the questions presented to them and based on the emotional stress of having to articulate their divided loyalties between parents and caregivers.[14]

" 'Due process requires a balance.' " (*Thomas R.*, *supra*, 145 Cal.App.4th at p. 733.) Upon review of the entire record, the juvenile court engaged in the requisite, "careful weighing of the interests involved." (*Jennifer J., supra*, 8 Cal.App.4th at p.

---

[14] The evidence supporting the juvenile court's determination includes the Department reports throughout the dependency proceedings documenting the children's difficulty at times in communicating and making themselves understood, as well as social worker Carrillo's declaration and testimony describing her interactions with the children, their statements to her, and the fact that with each continuance of the 366.26 hearing the children had "experienced multiple emotional and difficult conversations about permanency."

1089.)  We conclude that substantial evidence supported the juvenile court's balancing of the risk of psychological harm to the children against the likely material effect of their proposed testimony on the relevant issues, and the juvenile court did not abuse its discretion or violate father's due process right to a meaningful hearing when it precluded father from calling the children as witnesses, whether in the courtroom or in chambers.

Having determined that father's arguments on appeal do not supply a basis for reversal of the juvenile court's decision, we affirm the termination of parental rights as to father.  We likewise affirm the termination of parental rights as to mother, whose appeal makes no arguments independent of those asserted by father.

## III.  DISPOSITION

The juvenile court's July 22, 2020 order pursuant to Welfare and Institutions Code section 366.26 terminating father's and mother's parental rights is affirmed.

_____
                                       Danner, J.

WE CONCUR:


_____
Greenwood, P.J.


_____
Grover, J.


**H048307**

*In re A.R., et al.; DFCS v. S.R., et al.*